# EXHIBIT 2

h7h2mirC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MIRROR WORLDS TECHNOLOGIES,
LLC,

                 Plaintiff,              New York, N.Y.

          v.               17 Civ. 3473(JGK)

FACEBOOK, INC.,

                 Defendant.

------------------------------x

                              July 17, 2017
                              4:40 p.m.

Before:

                HON. JOHN G. KOELTL,

                           District Judge

                       APPEARANCES

RUSS AUGUST & KABAT
     Attorneys for Plaintiff
BY:  MARC A. FENSTER

AMSTER ROTHSTEIN & EBENSTEIN, LLP
     Attorneys for Plaintiff
BY:  CHARLES R. MACEDO

COOLEY, LLP
     Attorneys for Defendant
BY:  HEIDI KEEFE

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

h7h2mirC

h7h2mirC

1          (Case called)

2          MR. FENSTER:  Good afternoon, your Honor.  Marc

3   Fenster, with Russ, August & Kabat, on behalf of the plaintiff.

4   With me today is Charles Macedo.

5          MS. KEEFE:  Good afternoon, your Honor.  Heidi Keefe

6   on behalf of Facebook.

7          THE COURT:  Good afternoon.  Good to see you all.

8          I have your Rule 26(f) report.  What I don't have is

9   the courtesy copy of the complaint and the answer, which my

10  local rules ask both sides to provide me a courtesy copy of.

11         MR. FENSTER:  I apologize to the court, your Honor.

12         MS. KEEFE:  My apologies, your Honor.  I will make

13  sure to get you that.

14         MR. MACEDO:  Your Honor, I have both right here if you

15  would like.

16         MS. KEEFE:  I appreciate that.  Thank you, sir.

17         THE COURT:  All right.  Fine.

18         I appreciate it's a patent infringement case.

19         Mr. Fenster, do you want to just tell me about your

20  case?

21         MR. FENSTER:  Sure.  Your Honor, do you prefer that I

22  use the podium?

23         THE COURT:  Either way.

24         MR. FENSTER:  Your Honor, this is a patent

25  infringement case involving three patents that are asserted.

h7h2mirC

1          There is some history with the patents, not between

2     these parties, but there is some history that you will hear

3     about in this case.  The patents relate to an invention by

4     Professor Gelertner from Yale and several other inventors, and

5     it relates to a document management system that is a

6     stream-based system.

7          Instead of the old, conventional file directory system

8     of storing files in directories with file names, he envisioned

9     and invented a new stream-based system that uses a main stream

10    and a sub stream that are both persistent.  This is described

11    in the '227, '439 and '538 patents.

12         The accused devices, the accused systems are

13    Facebook's system that is implemented on two types of servers

14    that implement their News Feed, for example.

15         The patent is owned by Mirror Worlds Technologies,

16    LLC.  The patents have expired.  They expired last year.  So

17    this is a reasonable royalty case.  We will be seeking

18    reasonable royalty in terms of damages.

19         The '227 patent --

20         THE COURT:  I'm sorry.  The royalties for the period

21    while the patents were valid and allegedly infringed by

22    Facebook?

23         MR. FENSTER:  That's correct.

24         THE COURT:  Okay.

25         MR. FENSTER:  And then the '227 patent, I mentioned

h7h2mirC

1   that there is some history with that '227 patent.  In prior

2   litigation against Apple and Microsoft, that patent was

3   litigated, it was subjected to two reexaminations in which the

4   patent office upheld the validity of the claims asserted in the

5   '227 in this case.  The '227 patent was also challenged in a

6   CBM -- covered business method -- proceeding before the PTAB,

7   the Patent Trial and Appeal Board, addressing such issues as

8   patent subject matter eligibility under Section 101 and the

9   PTAB denied institution, finding the patent valid in that case

10  as well.

11          The claim from that patent, the '227, that will be at

12  issue in this case, is Claim 13 in terms of the independent

13  claims.

14          THE COURT:  Okay.  It is a little premature, but do

15  you think that the issues involved in the patent or the patents

16  are so complicated that a person of my vastly limited technical

17  expertise would require the assistance of a court-appointed

18  expert?  I'm not a big fan of court-appointed experts, but I

19  usually ask the parties about that.  Or do you both think that

20  either the technology that's involved in the patents is not so

21  complicated or your own experts can explain it to me that it

22  won't be necessary to have a court-appointed expert just to

23  assist the court?

24          MR. FENSTER:  Our view, your Honor, is that a

25  court-appointed expert is not necessary in this case.  While

h7h2mirC

1    the subject matter is technical, both sides will have experts,

2    and I think that while there are some technical issues

3    certainly involved in the patents, they are not so impenetrable

4    that, if we do our jobs right, we can't explain it well to the

5    court.  So I do not think that the court will need or benefit

6    from a court-appointed expert.

7              THE COURT:  I am going to turn to Facebook anyway

8    right now for an explanation.

9              I should say at the outset I have a niece who works

10   for Kirkland who has, and I suspect still does, do work on

11   Kirkland matters for Facebook.  I don't disqualify myself in

12   Kirkland matters.  She is a nonshare partner at Kirkland.  I

13   would disqualify myself and wouldn't expect to see a matter

14   involving Kirkland on which she was working, and I haven't had

15   a situation where I would disqualify myself in a Facebook

16   matter.  I don't know anyone, as far as I know, at the

17   plaintiff's firm and I actually don't know or at least don't

18   know that I know anyone at Cooley.

19             MS. KEEFE:  Thank you, your Honor.

20             THE COURT:  Okay.

21             MS. KEEFE:  I personally don't see a conflict there,

22   nothing that we would raise.

23             As to your Honor's question about the use of a

24   technical expert, I agree with Mr. Fenster that this is not the

25   type of a case that I think your Honor would require one.  In

h7h2mirC

1   fact, I look very much forward to helping teach your Honor

2   about the technology, and I think you will enjoy it.  It is not

3   overly complicated.  It certainly is interesting, but it is

4   just about different ways to store information on the back side

5   and then potentially present it on the front side.

6          As far as the case for Facebook goes, one of the

7   reasons that we actually were seeking your Honor's help in some

8   more rigid early claim charting or trying to understand the

9   allegations against Facebook is because Facebook truly doesn't

10  understand how the patents apply to us.

11         I think after plaintiff sees our source code -- as

12  soon as we agree on a protective order, we will be producing

13  our source code happily, so that they can understand that we

14  just don't store things.  We don't have that type of an

15  operating system on our back end.  And that was one of the

16  reasons that we had asked the court for a deviation from the

17  New York Southern District local rules, which don't require

18  that strenuous of claim charting up front, nor do they allow

19  for us to ask an interrogatory which also asks for claim

20  charts, so that we can understand how they are reading the

21  claims to cover the technology that we have.

22         So that is why we asked your Honor for the deviation

23  from the Southern District of New York local rules to implement

24  something closer to the patent local rules from the Northern

25  District of California which require claim charts up front that

h7h2mirC

can only be amended with good cause.  And of course we would

give them the code far in advance of that so that those charts

could take the benefit of really understanding what the

technology is.

     And if for any reason your Honor didn't want to go

there, I would at least ask for essentially dispensation from

the local rules which also prevent us from asking a contention

type interrogatories until the end of the case, to be able to

serve one early, again, so that we could understand how they

think that these claims actually apply to the system that

Facebook has, since we don't think they are the same.

     THE COURT:  Okay.  We obviously have more limited

procedures than the Northern District of California, and we are

enthusiastic about our more limited procedures and think that,

with all respect to the Northern District of California, they

are too rigid, they cause too much unnecessary work, and they

are unnecessary.

     Similarly, with respect to interrogatories, the

Southern District in general is resistent to interrogatories

because we think that they are written by lawyers, answered by

lawyers, and tend to obfuscate, rather than clarify.  Because

what lawyers do is they try to answer interrogatories in such a

way as to keep all of their options open, so you get long

obfuscatory answers that really don't move the case along a

lot.

h7h2mirC

1          A third point -- because I know it is raised in the

2   Rule 26(f) report -- is, our local rules specifically don't set

3   up a date for the claim construction hearing because each case

4   is different and our experience in many cases is you don't need

5   a claim construction hearing prior to the motion for summary

6   judgment.  It certainly depends on the individual cases.

7          In some cases, the parties come in and say, We have

8   200 claims at issue, and as to each of those claims, we think

9   that there are five separate claim construction issues that

10  your Honor has to decide; and, lo and behold, you get to the

11  motion for summary judgment and you find out that there are

12  just a few issues and that everything that you have been asked

13  to construe with the exercise of a lot of work turns out to be

14  nondispositive, so that the motion for summary judgment might

15  actually be the occasion for the claim construction hearing and

16  the need to construe the claims in light of what the parties

17  tee up as the dispositive issues.

18         This may or may not be that case.  I go in with the

19  background of our local rules and the background of being able

20  to decide claim construction issues in the context of motions

21  for summary judgment, and with an aversion that can be

22  overcome, depending upon the individual case, to having a

23  schedule based upon the need for a claim construction hearing

24  and the subsequent deadlines keyed to the decision at the claim

25  construction hearing.  Because often without knowing what the

h7h2mirC

dispositive issues are for a motion for summary judgment, the

tendency of the parties would be to keep as many balls in the

air as possible and ask for a construction on as many things as

possible, even though they may not be dispositive in the case.

So I don't know how this case will proceed.  I am

perfectly happy to keep matters open, and things may change

depending upon how the case develops.

So the plaintiff in the submission before me said

essentially Facebook doesn't even know at this point what we

are going to say, or the specifics, as least as I understand

it, the specifics of the patent claims that were allegedly

infringed.  Now, if the plaintiff comes forward with 200

alleged claims that were allegedly infringed in 400 different

ways, maybe I will think differently about where the case is.

And maybe if, at another conference, after Facebook has

disclosed the source code to the plaintiff under a

confidentiality order and renews the argument to me that there

is, you know, no basis for the case, I can look again at the

issue of an interrogatory, contention interrogatory, or more.

But the plaintiff may be able to persuade me that that is not a

good idea.  I certainly have, in other cases, despite the local

rule, or consistently with the local rule, pursuant to court

order, said, yes, you can give some limited interrogatories.

So let me ask another question.  The plaintiff has

said that there has been litigation with Apple and Microsoft

h7h2mirC

1    with respect to the same patents, one or more of the patents.

2    What was the outcome of those litigations?

3              MR. FENSTER:  So both have been resolved through

4    settlement and licensing.  The Apple litigation went farther.

5    That actually went to a jury verdict.

6              THE COURT:  Where?

7              MR. FENSTER:  In the Eastern District of Texas.  And

8    there was a verdict of infringement and validity.  There was a

9    JAMOL on infringement and then a subsequent appeal.  The

10   validity determination was upheld.  The JAMOL was upheld.  A

11   subsequent case was filed and a settlement ensued.  There were,

12   I believe, two orders construing the claims of the '227 in

13   those cases.  The Microsoft case was also filed in the Eastern

14   District of Texas, and that was settled as well.

15             THE COURT:  Okay.  This case was filed in the Southern

16   District rather than the Eastern District of Texas.  Was that

17   because of the Supreme Court's decision on venue?

18             MR. FENSTER:  The venue consideration did -- we did

19   file in the Southern District of New York because Facebook has

20   significant offices here and we thought that venue was proper.

21   I think that *T.C. Heartland* had not yet issued at the time, but

22   it was certainly pending at the time that we filed in May.

23             THE COURT:  Well, welcome.

24             MR. FENSTER:  Thank you.

25             THE COURT:  Okay.  So looking over the 26(f) report, I

h7h2mirC

1    have essentially given you my views that we should have a

2    strict schedule rather than a delayed schedule, depending upon

3    the claim construction hearing, which may not go forward before

4    I see the motions for summary judgment.  I am open if the

5    number of claims or alleged infringement contentions become too

6    great.

7            I was troubled by the fact that you all, even with a

8    firm schedule, have scheduled the case to take two years.  That

9    is a long time in this court.  Both sides think it is going to

10   take that long?  How much is a realistic *ad damnum* from the

11   plaintiff.

12           MR. FENSTER:  I'm sorry.  I missed the last question,

13   your Honor.

14           THE COURT:  How much is a realistic *ad damnum* from the

15   plaintiff?  What are we talking about?

16           MR. FENSTER:  In terms of?

17           THE COURT:  Money.

18           MR. FENSTER:  Oh.

19           THE COURT:  Damages, *ad damnum*.

20           MR. FENSTER:  Oh, we were talking about schedule.

21           We are formulating -- the damages will be formulated

22   after we get discovery from the plaintiff.  I expect it will be

23   a significant case.  Something in the $100 million range I

24   expect to be the damage number at trial.

25           THE COURT:  Okay.  What was the Apple verdict in the

h7h2mirC

1  Eastern District of Texas?

2      MR. FENSTER:  The verdict was $625 million, and that

3  was vacated on JAMOL.

4      THE COURT:  Sorry?

5      MR. FENSTER:  It was vacated on JAMOL for

6  infringement, not because of damages.  But the damage number

7  that was awarded by the jury was $625 million.

8      THE COURT:  Is Facebook in a different position from

9  Apple.

10      MR. FENSTER:  In terms of?

11      THE COURT:  In terms of the case.

12      MR. FENSTER:  In general, I think yes.  The accused

13  systems are different.  I think that the infringement by

14  Facebook, at least based on what we have seen so far, is more

15  clearly within exactly what Professor Gelertner was envisioning

16  when he came up with his invention.

17      THE COURT:  Facebook says not at all.

18      MR. FENSTER:  They say not at all, and we will review

19  the source code, and that's what the case will ultimately be

20  about.

21      But in terms of our view, they do have different --

22  the accused systems are different.  We think that the accused

23  system in this case is actually a little bit clearer

24  infringement read based on what we have seen so far without the

25  benefit of discovery than -- not than the Apple case was, it

h7h2mirC

1   was just a different reading.  Anyway, so they infringe

2   differently.  The accused systems, they infringe in different

3   ways.  The scope of infringement is a little bit different.

4   The damages model I expect to be a little bit different as

5   well.  Facebook, the way they derive their revenue is a little

6   bit different than Apple.

7           THE COURT:  Okay.

8           Yes.

9           MS. KEEFE:  Your Honor, the only point I would make

10  from that is exactly what I was saying in terms of not

11  understanding the read.  We don't operate the same way that

12  Apple does.  We are not the same kind of company.  We don't

13  have an operating system.  The patents talk about an operating

14  system and the way things are stored.  So the fact that they

15  are using the same patents against Facebook that they did

16  against Apple is precisely the reason that we really don't

17  understand the infringement read against us, and that is why --

18  I fully appreciate everything your Honor has said, but that's

19  why I am so insistent that some type of early discovery would

20  be so useful.

21          Typically when we try to ask those types of questions

22  during a 30(b)(6) or some type of deposition we get, no, no,

23  that's for the expert, that's a legal argument, we are not

24  going to tell you, and that's why we are so desperate to have

25  something like a chart, interrogatory, or something of that

h7h2mirC

1    nature, so that we know what we are aiming at as the case goes

2    forward since we are so different from Apple, even per

3    Mr. Fenster's own admission.

4              THE COURT:  Well, under the proposed schedule, there

5    will be disclosure of the asserted claims and infringement

6    contentions by August 31, and then Facebook would have -- why

7    do you think that wouldn't give you sufficient understanding of

8    what the plaintiff is claiming?

9              MS. KEEFE:  Because the way I understand the rules,

10   your Honor, is simply that they have to say it is Claims 1

11   through 4 against News Feed and it doesn't explain to us how or

12   what within News Feed does that.  The complaint already says at

13   least one claim of each of the patents against News Feed.  The

14   problem is, we really don't understand how they are reading it

15   against News Feed since, like I said and like Mr. Fenster has

16   said, it is so different from Apple or the types of products

17   they were accusing Apple of infringing with.

18             Unless the infringement contention needs to have more,

19   something like, What are they attacking in Facebook as the

20   stream, the thing that has every piece of data stored

21   chronologically, something other than simply pointing at a

22   large product like News Feed and just saying it is in there

23   somewhere does not explain to us how those claims are being

24   read on the product.

25             THE COURT:  Okay.

h7h2mirC

1      MS. KEEFE:  It is unfortunately not like a product

2  case where you can easily take the product apart and kind of

3  guess which piece goes against which.  It's an entire code

4  base.

5      THE COURT:  All right.

6      Plaintiff?

7      MR. FENSTER:  Your Honor, the local rules provide an

8  ordered system for disclosure of infringement contentions.  We

9  have provided a very detailed complaint as you go through, and

10  then we will provide the information per the discovery that we

11  get in this case.  This is a case where we will have to review

12  source code and then we will have expert disclosures, and that

13  will be -- the Southern District has local rules --

14      THE COURT:  No, I understand.  I was involved in

15  drafting these, and they were meant to be simple.  They were

16  meant to avoid needless work.  But we will see if in fact they

17  work or they don't work.

18      How many claims are alleged to be infringed.

19      MR. FENSTER:  So, your Honor, our actual disclosure

20  will be on August 31.  What we have identified in the complaint

21  are three representative claims from -- one representative

22  claim from each patent.  There are only a handful of

23  independent claims from each of the patents.

24      So, for example, for the '227, I expect that Claim 13

25  will be the independent claim that's asserted.  There are only

h7h2mirC

1    I think four independent claims in each of the other two

2    patents.

3         So this is not a huge number of claims and we don't

4    intend to unduly burden the court or the parties.  We intend to

5    litigate this case efficiently and in a directed way to test

6    our infringement theory.

7         MS. KEEFE:  Your Honor, there are over 115 claims in

8    the patents at issue, and the fact that there is limited number

9    of independents does not mean that they are not going to assert

10   multiple dependents to try to get away from prior art.  So

11   everything that I have asked for I think still stands, and the

12   very fact that Mr. Fenster implied just a few minutes ago that

13   it might be not until we get expert reports that we understand

14   the infringement allegations, to me, just doesn't work to move

15   the case forward, especially if this is a case that could be

16   early resolved by virtue of the fact that the claims simply

17   don't read on our products.

18        THE COURT:  Okay.

19        Plaintiff tells me that there are how many independent

20   claims in the three patents?

21        MR. FENSTER:  There are approximately, I think there

22   are four independent claims in the '439; four in the '538, I

23   believe that's right; and one that will be asserted -- so there

24   are four independent claims in the '439, there are three

25   independent claims in the '538, and there is one that will be

h7h2mirC

1   asserted from the '227.

2          THE COURT:  And how many dependent claims do you

3   foresee?

4          MR. FENSTER:  I don't have that number exactly.  But I

5   take what the court has said and we will not be unreasonable;

6   and, if we are unreasonable, I expect to answer to the court

7   for it.

8          THE COURT:  All right.  It is fairly simple, right?  I

9   will remember what you have said -- by the way, did one of you

10  ask for the court reporter?  Or both of you?

11         MR. MACEDO:  Yes, your Honor, we asked, just because

12  we knew that there was a disputed issue on the transcript.

13         THE COURT:  Okay.  It is unusual for me to have a

14  court reporter at a conference with the lawyers because I tend

15  to trust the lawyers who appear before me.  So when they say

16  things, I rely on the fact that they -- is Facebook standing

17  because they asked for the reporter, too?

18         MS. KEEFE:  No.  In fact, we did not ask for it.  I

19  was very surprised to see one.

20         THE COURT:  That's okay.  You don't have to underline

21  what I say.

22         So I trust the lawyers and I tend to remember what

23  lawyers tell me.  I tell lawyers at conferences that if they

24  should see a court reporter appear at a conference, that is not

25  a good sign, because it is an indication that this is a case

h7h2mirC

```
1    where I can't trust the lawyers.  But in cases which have high
2    stakes, sometimes the lawyers think that they have to ask for a
3    reporter.  They have every right to ask for a reporter.  But it
4    does make me at least wary of the representations by the
5    lawyers, but at least we have a transcript then.
6            Okay.  So where we were was, I was raising a question
7    about whether a two-year schedule is really necessary.
8    Facebook's schedule would have been even longer because it
9    would depend on when I would decide the claim construction
10   issues.
11           So you tell me.  You have obviously litigated these
12   cases before.  You know this case.  If you tell me it is really
13   necessary to have May of 2019 as the date, and realistically
14   that would be put off, because if you are doing dispositive
15   motions on January 11, they are not going to be fully briefed
16   until March, and then it will take time to decide those
17   motions, so May of 2019 would be put off.  So you tell me
18   whether close of discovery is December 14, 2018.  If I cut back
19   on that, it would be arbitrary on my part, because I have no
20   basis to tell the parties that they really have to finish it
21   earlier.
22           MS. KEEFE:  Your Honor, I think the parties worked
23   very hard to come to a plan together that works, given we have
24   litigated actually against each other before, and --
25           THE COURT:  Do you get along?
```

h7h2mirC

1          MS. KEEFE:  We do, very much so, your Honor.

2          THE COURT:  Okay.  That's good.

3          MS. KEEFE:  And I think that the schedule gives us the

4    leeway that sometimes has to happen when other people have busy

5    schedules and you need small extensions, this schedule allows

6    for all of that.  It also accommodates both parties' other

7    trial dates, so that we can stick to something firm.  So I

8    would implore your Honor to stick with it as it is presented.

9          THE COURT:  Great.  I will.

10          MR. FENSTER:  Your Honor, just -- this schedule was

11    something that we worked together.  Our preference is certainly

12    to have a shorter schedule; and, if the court is inclined, the

13    place to carve back, I think, would be from the close of fact

14    discovery.  I think several months can be taken off of that if

15    the court is inclined.  If not, this is something that

16    Ms. Keefe and her team and our team worked out to come to you

17    with an agreed schedule, and we are okay with it.  But if the

18    court would like a shorter one, we concur.

19          THE COURT:  You mean the time from September to

20    December?

21          MR. FENSTER:  No.  That time is actually pretty

22    reasonable, and I think is relatively blocked.  The time -- the

23    close of fact discovery being September 28, this has a close of

24    fact discovery and a close of expert discovery.

25          THE COURT:  Right.

h7h2mirC

1      MR. FENSTER:  The close of fact discovery is September

2      28, 2018.  That's a long time for fact discovery.  The parties

3      have actually agreed on reasonable limits on fact discovery

4      that you can see.

5          THE COURT:  I saw it.

6          MR. FENSTER:  So I think that September 2018 is

7      actually longer than we need for fact discovery and we could

8      move that whole schedule, the whole back end of the schedule up

9      by three or four months by shifting everything up, starting

10     with close of fact discovery.  Especially if we are not waiting

11     for a claim construction hearing necessarily, after the parties

12     brief claim construction in February, we will be able to finish

13     discovery.

14         THE COURT:  The defendant disagrees with that, I take

15     it.

16         MS. KEEFE:  Yes, your Honor.  We worked very hard to

17     come up with a schedule that would work for both sides,

18     including intervening dates and things of that nature.

19         THE COURT:  Okay.  I am not going to change the dates.

20     I have already cut back on the defendant's proposal by a lot by

21     not making it contingent on when I would get around to your

22     claim construction hearing.  So I will keep your dates.  You

23     can just give me a scheduling order that incorporates your

24     definite dates.

25         Claim construction hearing to be set by the court.

h7h2mirC

You know you will need a premotion conference before a
dispositive motion.  The hearing plainly has to be set at a
later point.  What you should have, you have a motions *in
limine* date.  What I would do with the motions *in limine* date
is, there should be the joint pretrial order, requests to
charge, *voir dire*, motions *in limine*, due 21 days after
decision of dispositive motions.  It is not realistic in this
case, but it is 21 days after decision of dispositive motions
or the close of expert discovery, if no dispositive motions or
*Daubert* motions, then responses and objections seven days
thereafter.

      MS. KEEFE:  Your Honor, may I ask a question?

      THE COURT:  Sure.

      MS. KEEFE:  So you said it is either 21 days after a
decision on dispositive motion or after the close of expert
discovery.  Does that mean if a motion is filed after the close
of expert discovery, that controls and it is only 21 days after
experts if no motions are filed?

      THE COURT:  Right.

      MS. KEEFE:  Thank you.  Just wanted to make sure.

      THE COURT:  I said or the close of expert discovery,
if no dispositive motions.

      MS. KEEFE:  Thank you, your Honor.

      THE COURT:  Responses and objections seven days
thereafter, and then you will be ready for trial.  So ready

h7h2mirC

1   trial 48 hours' notice, and I will give you more time than

2   that, but ready trial 48 hours' notice 21 days after submission

3   of the joint pretrial order.

4           MR. FENSTER:  Your Honor, may I ask, is it your

5   preference to have the *Daubert* motions decided with summary

6   judgment dispositive motions or with the motions *in limine*?

7           THE COURT:  My general preference is to have them with

8   motions *in limine*, but I see that you put them in at the same

9   time as the dispositive motions.  So if you think that the

10  *Daubert* motion really belongs with the dispositive motions

11  because the dispositive motions rely on expert testimony and

12  you really want to get a motion in to say that the experts

13  can't be relied upon, that's okay.

14          MR. FENSTER:  They can be filed with the motions *in*

15  *limine*.

16          THE COURT:  I'm sorry?

17          MR. FENSTER:  So we didn't know which way the court

18  preferred it.  If the court prefers it with the motions *in*

19  *limine*, what I understand you to be saying now is they can be

20  filed with the dispositive motions, but you will also accept

21  them with the motions *in limine*, is that correct?

22          THE COURT:  Yes.

23          MS. KEEFE:  Understood.

24          THE COURT:  If the dispositive motions really depend

25  on a *Daubert* motion, you can file your *Daubert* motion along

h7h2mirC

1   with the dispositive motion.  I know that districts differ.  My

2   preference is not to clutter a dispositive motion with other

3   motions which are thinly disguised efforts to evade the page

4   limits.  So it is not preferred to file a motion to strike the

5   supporting affidavit on a motion for summary judgment on the

6   grounds that the following paragraphs refer to evidence that's

7   not properly considered on a motion for summary judgment, and

8   to have that be a separate 25-page motion with an accompanying

9   appendix that attacks the evidence on the motion for summary

10  judgment.  But I am told that that is -- I mean, it happens

11  from time to time in this court, and I am told that lawyers

12  believe that in some other districts that's the way to proceed

13  and it's really necessary if you are going to challenge the

14  purported evidence that's being proffered in support of the

15  motion for summary judgment.  It is not common in this district

16  and it is, in my view, plainly, an effort to circumvent the

17  page limits.

18          Similarly, and I am sure that we will get to this down

19  the road, I have a 25-page limit for briefs in support and in

20  opposition to a motion for summary judgment, and parties have

21  been known to attempt to circumvent that by incorporating by

22  reference their 56.1 statement under our local rules or

23  incorporating by reference their supporting affidavits with a

24  statement that in order to avoid repetition and for the benefit

25  of the court, they incorporate by reference the supporting

h7h2mirC

1   affidavits.  It's not for the court's benefit.  It is to

2   circumvent the 25-page limit.  Briefs have to be

3   self-contained.  They have to contain a statement of the facts

4   on which the motion is based as well the law.  If you need

5   more pages, ask for it.  Don't do by subterfuge what you can't

6   do directly.  Don't fiddle with the font, eliminate margins,

7   compress the type.

8          Okay.  I think it would be useful in this case,

9   because you have -- I will sign the 26(f) report and so order

10  it just because it contains agreements with respect to

11  discovery that I think are very useful.  So I will sign it, and

12  then you can also present to me the agreed-upon schedule which

13  I will also sign.

14         I will set up another conference with you in mid

15  December, which should be enough to see where you all are in

16  terms of claim construction and contentions.

17         MS. KEEFE:  May I simply go grab my calendar, your

18  Honor, so I can --

19         THE COURT:  Sure.

20         MS. KEEFE:  Excuse me.

21         THE COURT:  Do you think that's time enough?

22         MS. KEEFE:  I think it is, your Honor.

23         THE COURT:  If you want me to do it earlier, I would

24  do it earlier.  But I think, under your schedule, mid December

25  is probably the best.

h7h2mirC

1          MS. KEEFE:  The only reason that I think earlier is

2     better is because if we were to come back and say to your

3     Honor, we really do need that interrogatory, having it earlier

4     so that it could then be used by the parties in the claim

5     construction efforts, that's where I think it would be very

6     helpful to perhaps meet with your Honor either in October or

7     November.

8          THE COURT:  Fine.  I will meet with you at the end of

9     October.  And all you have to do to meet with me is write me a

10     letter.

11          MS. KEEFE:  Thank you, your Honor.  Let me go grab my

12     calendar and we can pick a date.

13          THE COURT:  Sure.

14          (Pause)

15          MS. KEEFE:  Thank you, your Honor.

16          MR. FENSTER:  Your Honor?

17          THE COURT:  Yes.

18          MR. FENSTER:  I anticipate that October may be a bit

19     early.  We are in mid July.  We do not have a protective order

20     negotiated yet and no discovery of source code or anything else

21     has been made.

22          THE COURT:  Okay.

23          MR. FENSTER:  So I anticipate that October may be

24     early, and it may be more useful on the time frame that the

25     court indicated.

h7h2mirC

1          THE COURT:  But shouldn't it be before November 17.

2          MS. KEEFE:  That was what I was suggesting, your

3    Honor.

4          MR. FENSTER:  November 17?

5          THE COURT:  That's the exchange of proposed claim

6    construction terms.

7          MS. KEEFE:  That's right.  That's why I was suggesting

8    something earlier, your Honor.

9          Your Honor, I have a PTAB -- Patent Trial and Appeal

10    Board -- trial that day, so I will be in Washington, D.C.

11          THE COURT:  The 9th?

12          MS. KEEFE:  I could come up here from D.C. very

13    easily, your Honor.

14          MR. FENSTER:  I have a summary judgment hearing in

15    Northern District of California that day, your Honor.

16          THE COURT:  The 10th?

17          MR. MACEDO:  The 10th is Veterans Day.

18          MS. KEEFE:  I can do it, your Honor, but I don't know

19    if he can make it out from California in time.

20          THE COURT:  The 14th?

21          MS. KEEFE:  I could do the 14th, your Honor.  We are

22    getting very close to the date of the 17th is the only problem

23    if anything needed to happen.  I wonder if we could go backward

24    as week.

25          MR. FENSTER:  Your Honor, I am actually scheduled to

h7h2mirC

```
 1   be here in New York for the 16th/17th.  If we could schedule it
 2   for the 15th, that would save a separate trip.
 3           MS. KEEFE:  Mr. Fenster, I'm sorry.  I have a summary
 4   judgment hearing in the Northern District on the 16th, so I
 5   can't do that.
 6           THE COURT:  How about November 3?
 7           MS. KEEFE:  I could do that, your Honor.
 8           THE COURT:  2:30, November 3.
 9           MS. KEEFE:  Thank you, your Honor.
10           THE COURT:  No.  Hold on.  I'm waiting.
11           MS. KEEFE:  Oh, I apologize.
12           THE COURT:  I am waiting for Mr. Fenster.
13           MR. FENSTER:  Thank you, your Honor.  I think that
14   works for us.
15           THE COURT:  Okay.  Great.  November 3, at 2:30 p.m.,
16   another conference; and if you need to talk to me before then,
17   I could set up a telephone conference with you so that you
18   don't have to fly in.
19           MS. KEEFE:  I appreciate that your Honor.  Thank you
20   very much.
21           MR. MACEDO:  Your Honor, you said 2:30?
22           THE COURT:  2:30.
23           Okay.  Anything else we can do today?
24           MR. FENSTER:  Not for plaintiff, your Honor.
25           MS. KEEFE:  I can't think of anything, your Honor.
```

h7h2mirC

1          THE COURT:  Okay.  Good to see you all.  I look

2     forward to working with you.

3          MS. KEEFE:  Thank you, your Honor.  Thank you for your

4     time.

5          MR. FENSTER:  Thank you, your Honor.

6                              – – –

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25